```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL TUNO, et al.          :    CIVIL ACTION
                              :
          v.                  :
                              :
NWC WARRANTY CORPORATION,     :
et al.                        :    NO. 11-3958
```

MEMORANDUM

Dalzell, J.                                July 31, 2013

Michael Tuno and his company, World Class Dealer Services ("WCDS"), bring this fraudulent misrepresentation action against Diana Hagmaier and the companies she runs -- NWC Warranty Corporation, the National Warranty Corporation, and NWC Administration (the "NWC entities").  The claim arises out of alleged misrepresentations defendants made while plaintiffs sold the NWC entities' warranties, service contracts, and insurance coverage to car dealerships.  The defendants assert counterclaims for breach of contract and unjust enrichment, arguing that plaintiffs breached their contract by failing to pay defendants "cancellation chargebacks" under an agency agreement that governed the parties' relationship.

Before us are the defendants' motion for summary judgment on the plaintiffs' claim and on defendants' counterclaims, plaintiffs' opposition thereto, plaintiffs' second motion to compel discovery, and defendants' response in opposition thereto.

I.   Procedural History

On June 15, 2011, the NWC entities sued World Class Dealer Services in the Court of Common Pleas of Bucks County to recover damages from an alleged breach of contract that arose out of the transaction at issue here.  Pl. Resp. Ex. YY.  On June 16, 2011, Tuno and World Class Dealer Services initiated the instant action, and shortly thereafter they sought to remove to this Court the NWC entities' breach of contract action and consolidate the cases.  See Dkt. 3.  We denied this motion.

Defendants moved to dismiss, which in an earlier Order we granted in part when we dismissed plaintiffs' breach of contract claims.  Thereupon, plaintiffs filed an amended complaint asserting only a claim of fraudulent misrepresentation.

In their Answer to the amended complaint, defendants filed a counterclaim asserting the breach of contract and unjust enrichment claims that they had advanced in their initial state court suit.  After discovery, defendants moved for summary judgment on both the amended complaint and their counterclaims, which the plaintiffs oppose.

Before the close of discovery plaintiffs moved to compel document production, and we granted their motion.

Unsatisfied with the documents defendants produced, plaintiffs filed a second motion to compel that we also consider here.

We exercise jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because all plaintiffs are citizens of Pennsylvania, all defendants are citizens of Florida, and the amount in controversy exceeds $75,000.  See Am. Comp. ¶¶ 8 - 10; Answer ¶ 9.

II.  Standard of Review

    A.  Summary Judgment

    A party moving for summary judgment bears the initial burden of informing the district court of the basis for its argument that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact", Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

    If the moving party meets this initial burden, Fed. R. Civ. P. 56 then obliges "the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324.

3

A factual dispute is genuine

> [I]f the evidence is such that a reasonable
> jury could return a verdict for the
> nonmoving party. . . . The mere existence of
> a scintilla of evidence in support of the
> plaintiff's position will be insufficient;
> there must be evidence on which the jury
> could reasonably find for the plaintiff.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).

A fact is "material" if it "might affect the outcome of the suit

under the governing law".  Id. at 248.

We "must draw all reasonable inferences in favor of

the nonmoving party, and [we] may not make credibility

determinations or weigh the evidence."  Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), cited in Amour

v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001)).


B.    Fraudulent Misrepresentation

The parties agree that Pennsylvania law governs this

dispute.  See, e.g., Def. Mot. at 6-7; Pl. Resp. at 19 (both

rehearsing elements of fraudulent misrepresentation under

Pennsylvania law).

In order to sustain a claim of fraudulent

misrepresentation in Pennsylvania, a plaintiff must show:

> (1) A representation (2) which is material
> to the transaction at hand; (3) made
> falsely, with knowledge of its falsity or
> recklessness as to whether it is true or
> false; (4) with the intent of misleading
> another into relying on it; (5) justifiable

4

> reliance on the misrepresentation; and, (6)
> the resulting injury was proximately caused
> by the reliance.

Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania, 7 A.3d 278, 290 (Pa. Super. 2010).

As our Court of Appeals has explained, under Pennsylvania law "the deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than does an intentional affirmation of a material falsity." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 611 (3d Cir. 1995) (quoting Neuman v. Corn Exchange Nat. Bank & Trust Co., 51 A.2d 759, 764 (Pa. 1947)) (internal alterations omitted).

The plaintiffs rely on Duquesne Light's quotation of Smith v. Renaut, 564 A.2d 188 (1989) that "fraud consists in anything calculated to deceive, whether . . . it be . . . by speech or silence . . . It is any artifice by which a person is deceived to his disadvantage." Duquesne Light, 66 F.3d at 611-12 (quoting Renaut, 564 A.2d at 192). But it bears noting that the next sentence of Duquesne Light stresses that "while a concealment may constitute fraud, mere silence is not sufficient in the absence of a duty to speak." Id. at 612 (quoting Renaut, 564 A.2d at 192).

A plaintiff must plead a claim of fraudulent misrepresentation with particularity pursuant to Fed. R. Civ. P.

9(b).  See, e.g., Bennett v. Itochu Int'l, Inc., 682 F. Supp. 2d 469 (E.D. Pa. 2010) (Joyner, J.) (applying 9(b) standard to fraudulent misrepresentation claim).

Finally, we note that under Pennsylvania law each element of a claim of fraud must be proved by clear and convincing evidence rather than by a preponderance of the evidence.  See, e.g., Moser v. DeSetta, 589 A.2d 679, 682 (Pa. 1991) ("a party alleging fraud has the burden of proving the same by clear and convincing evidence"); Bearshall v. Minuteman Press Int'l, Inc., 664 F.2d 23, 26 (3d Cir. 1981) (quoting Snell v. Pennsylvania, 416 A.2d 468, 470 (Pa. 1980) for the same proposition).

As the United States Supreme Court has explained, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." Anderson, 477 U.S. at 254.  Thus, "when the nonmoving party faces a clear and convincing standard of proof, as it did in Anderson . . . a genuine issue of fact exists if the evidence in the record could support a reasonable jury finding" that plaintiffs have proven each element by clear and convincing evidence.  Honeywell, Inc. v. Minolta Camera Co., Ltd., Nos. 87-4847, 88-1624, 1991 WL 50063, at *3 (D.N.J. Apr. 5, 1991) (citing Anderson, 477 U.S. at 255).  Where defendants

have met their burden of informing us of the basis for their
argument that there is no genuine issue of material fact,
summary judgment is thus warranted unless the plaintiffs can
show that the evidence would support a reasonable jury finding
of each element of their fraudulent misrepresentation claim by
clear and convincing evidence.

III.  <u>Facts Regarding Alleged Misrepresentations</u>

        This action concerns alleged misrepresentations
Hagmaier and the NWC entities made between June 1, 2006 and
March 12, 2010.

        Plaintiffs entered into a "dealership agreement" with
defendants whereby plaintiffs agreed to sell defendants' service
products to car dealerships in exchange for a commission.  The
essence of the complaint is that in 2007 and 2008 Hagmaier and
the NWC entities "adopted unlawful and deceptive policies and
practices that resulted in the routine denial of claims covered
by the agreements that were sold by the Plaintiffs to the
automobile dealerships", Comp. ¶ 20, and that in 2009 and 2010
the defendants allegedly made false claims regarding their Tire
and Wheel warranty.  <u>Id.</u> at ¶ 32.  As a result of these
fraudulent policies and misstatements, "dealers would come to
Plaintiff Tuno, as President of WCDS, to pay on claims," <u>id.</u> at
¶ 26, and "various dealers terminated NWC programs, not only

7

decreasing Plaintiffs' commission, but also forcing WCDS to pay a cancellation chargeback fee to NWC."  Id. at ¶ 27.

As we noted above, essential to a claim of fraudulent misrepresentation -- the only claim plaintiffs bring here -- is the existence of a falsely-made representation or an omission in the face of a duty to disclose, so we will review defendants' allegedly fraudulent representations and omissions.

The defendants argue that no allegation amounts to a fraudulent misrepresentation, Def. Mot. at 10, and we agree that several of the plaintiffs' allegations are either stated with insufficient particularity or do not include false representations or omissions at all.  In order to consider plaintiffs' claim thoroughly and economically, where we here agree with the defendants that the factual allegations are patently insufficient to sustain a claim of fraudulent misrepresentation, we will dispose of them without extended analysis.

A.   Representations Regarding the Tire and Wheel Policy

The plaintiffs allege that the defendants made a number of fraudulent representations concerning the Tire and Wheel policy.  We turn now to consider them.

    1.   Representations Regarding the
        <u>Delay in Payments to Dealerships</u>

First, the plaintiffs argue that the defendants lied about how long they would need to pay dealers for Tire and Wheel claims.  Pl. Resp. at 6.  According to Bridget Bullion, NWC's claims manager from 2005 until July 2010, <u>see</u> Hagmaier Dep., Pl. Resp. Ex. G at 45, beginning in the fall of 2009 and continuing through 2010, about sixty-five to seventy-five percent of the claims NWC received -- about five or six hundred of them -- were not paid in a "timely fashion."  Bullion Dep., Pl. Resp. Ex. F at 44-45; 102.  Tuno alleges that many claims went unpaid for as long as six months.  Tuno Dep., Def. Mot. Ex. C at 161-162.

The plaintiffs allege that both Hagmaier and Bullion made false statements about the cause of this delay.

Bullion testified that she responded to dealers' complaints about delays by saying

> whatever I needed to do within some confines
> . . . I might tell them that we changed our
> system.  I might tell them that we have some
> new people working for us and we're a little
> backlogged.  There was a lot of song and
> dance that I did to keep people from coming
> basically through the phone and strangling
> me for not receiving their payment.

Bullion Dep., Pl. Resp. Ex. F at 50.  Bullion also told a dealer that a claim that they had not yet processed had "slipped through the cracks" because it had been "handed over to [a]

supervisor, who was reviewing it and got called out of the office unexpectedly."  1/21/10 E-mail, Pl. Resp. Ex. Q.

The plaintiffs have pointed to no evidence suggesting that Bullion's January 21, 2010 statement was false.  The only evidence that Bullion made false representations -- her general statement that "[t]here was a lot of song and dance" in her discussions with dealers -- refers specifically to conversations she had over the phone.  Thus, although we will consider the phone conversations Bullion refers to in her deposition, we will not consider the January 21, 2010 statement further.

With respect to Hagmaier, plaintiffs identify two e-mails they claim contain false statements.  On August 4, 2009, Hagmaier sent an e-mail to Tuno in which she said, "We have been working with GAIC regarding weekly submittal of TW claims so the reimbursement can be made to [dealers] within 30 days."  Pl. Resp. Ex. R.[1]  On September 18, 2009, Hagmaier sent another e-mail saying the NWC entities had "initiated a request to GAIC to process our TW claims for your store on a bi-monthly basis so we have more control on the 30 day turn around."  Id. Ex. N.

The plaintiffs say that Hagmaier "claimed that payment on Tire and Wheel claims was delayed and/or not provided because NWC's trust account and reserves were almost depleted."  Id. at

---

[1] The Tire and Wheel policy was insured by Great American Insurance Company (GAIC).  8/31/09 Letter, Pl. Resp. Ex. R; Def. Mot. at 32.

8.  In support, they point to several statements Hagmaier gave during her deposition.[2]  In it, Hagmaier testified that she sent an e-mail to Tuno telling him that the processing of a claim was delayed because defendants had to wait forty-five to sixty days for reimbursement from GAIC and that the reserves in defendants' trust accounts were exhausted.  Hagmaier Dep., Pl. Resp. Ex. G at 181-82.  Hagmaier explained the relationship between the reserves and GAIC's coverage:

> Q:  . . . it says, as you know, in two years
> DeSimone claims have eaten up the reserves.
>     Does that mean that the reserves were
> gone?
>
> A:  They were on the way of going, yes.
>
> Q:  If the reserves were gone, how were you
> going to pay out the claims if there was no
> monies [sic] for the reserves?
>
> A:  The clip would pick it up.
>
> Q:  When you say the clip, that would be the
> policy with Great American?
>
> A:  Yes.
>
> Q:  So once the reserves were exhausted,
> Great American was then responsible for
> payment?
>
> A:  Yes.

---

[2] Of course, statements made during a deposition after the plaintiff has filed suit cannot be the statements that gave rise to the plaintiffs' claim, and so we consider only the statements she made before suit.

Hagmaier Dep., Def. Mot. Ex. D, at 181-182.  Hagmaier also testified that Great American was the sole signatory on the trust account, id. at 117, and that Great American had control over the expenditure of funds in that account.  Id. at 161.

The plaintiffs aver that Hagmaier and Bullion also misleadingly attributed the delay in claims processing to a change in the payment system whereby GAIC would begin paying claims directly.  See 2/3/10 Letter from Bullion, Pl. Resp. Ex. U; 2/3/10 Letter from Hagmaier, Pl. Resp. Ex. V.  On February 23, 2010 Hagmaier wrote to Tuno and DeSimone BMW saying, "[w]e apologize for the delay as we have been working with our insurance company setting up a new payment process."  2/23/10 E-mail, Pl. Resp. Ex. Y.  On March 12, 2010 Hagmaier sent another letter saying, "we have recently made changes to our accounting department."  3/12/10 Letter, Pl. Resp. Ex. Z.

The plaintiffs argue that these statements were false in light of Bullion's deposition testimony regarding claims processing.  In response to the question, "what was, if any, NWC's involvement with respect to processing the claims after Great American had started this practice of having all the intake and processing being done with them?", Bullion testified,

> With regard to the tire and wheel claims
> only, Great American was obviously only
> taking care of the claims to which they had
> underwritten the policies.  So we still had
> tire and wheel claims coming in from runoff

12

> from the people who had been insured through
> Dealers Assurance.  So we still took tire
> and wheel claims.  We still processed them
> in the same manner that we had always
> processed them.

Bullion Dep., Pl. Resp. Ex. F. at 56-57.  The plaintiffs also contend that the veracity of the statements that GAIC was taking over processing claims is undermined by Hagmaier's statements in a March 30, 2010 letter to DeSimone BMW of Mt. Laurel, "indicat[ing] . . . that NWC was still handling the administration of its Tire & Wheel claims."  Pl. Resp. at 9.  In that letter, Hagmaier says that all communications with the dealerships will go directly through NWC rather than WCDS, and she writes, "I have been requested to address the thirteen pending claims that were not recognized by our current insurer, Great American Insurance Group."  3/30/10 Letter to DeSimone BMW, Pl. Resp. Ex. W.  This statement does not include a misrepresentation as the evidence demonstrates that under the new system GAIC would process the claims it backed, while NWC would process the claims insured through Dealers Assurance.  The statement that NWC "ha[d] been requested to address the thirteen pending claims" GAIC had not recognized is not inconsistent. Because, even drawing all reasonable inferences in the light most favorable to the plaintiffs, there is no misrepresentation

on the face of this evidence, and we will not consider this
claim further.

The plaintiffs also aver that Hagmaier falsely said
that GEICO was covering a claim of a customer named William
Messick: "Hagmaier responded by assuring that the insurer of the
claim was covering the damage.  These e-mails are attached as
Exhibit 'X'.  Hagmaier's claim was false, in that the insurer
had pre-approved the claim, but Hagmaier refused to pay the
monies owed."  Pl. Resp. at 26.  The plaintiffs do not support
this final assertion with a citation to the record, nor is it
apparent to which insurer they refer or exactly why an insurer's
pre-approval would render false Hagmaier's claim that such an
insurer was covering the damage.  We will thus not consider this
allegation.

The plaintiffs' contention that in 2010 "Hagmaier also
began to falsely claim that approved claims were being delayed
because said claims were not submitted properly", id. at 10,
also fails to constitute a fraudulent misrepresentation.  The
evidence the plaintiffs offer demonstrates only that Hagmaier
had changed the claims process and delayed the claims that did
not comply with the new process.  See Id. Ex. AA (letter from
dealership to staff explaining that "Effective immediately our
procedure will be to have your clients write ***in their own words***

14

the cause and effect of the tire failure on the NWC claim form where it states 'customer statement'" so that the dealership could "follow the exact procedure which NWC holds us and our clients accountable for") (emphasis in original).  Though the plaintiffs claim that "this new procedure was implemented in an effort to provide Hagmaier with a pretextual reason to delay and/or deny valid claims", id. at 10, this allegation, even if true, does not include a false representation or an omission, and, as such, cannot provide the predicate for a claim of fraudulent misrepresentation.

Similarly, the plaintiffs' contention that "[e]ssentially, Hagmaier denied claims unless the customer could overwhelmingly demonstrate that the damage was covered under the Tire & Wheel policy", id. at 11, does not constitute a fraudulent misrepresentation.  Nor are we persuaded that her behavior renders fraudulent Hagmaier's 2009 statement that "[o]ur responsibility . . . is not to find reason to deny each and every claim, our job is to verify that each and every condition of the contract language has been complied with and that the claim is valid based on the terms and conditions specified within the contract."  2/26/09 Letter, Pl. Resp. Ex. DD.  Hagmaier's language here is not factual, and thus could not have been falsely uttered.  Even reading the facts in the light

most favorable to the plaintiffs, the evidence supports only the conclusion that Hagmaier's method of verifying compliance with contractual conditions became more rigorous -- and so it does not render the earlier statement fraudulent.

> 2.   Representations Regarding the
>      <u>Profitability of the Tire and Wheel Policy</u>

The plaintiffs also allege that Hagmaier made fraudulent statements regarding the profitability of the Tire and Wheel policy.  The plaintiffs argue that in July of 2007 Hagmaier told Tuno that the Tire and Wheel policies were profitably priced, Pl. Resp. at 8 (citing 6/4/07 E-mail, Pl. Resp. Ex. R), but that in January of 2008 she said that they were not profitable but that she "anticipate[d]" they would become so.  <u>Id.</u> (citing 1/2/08 E-mail, Pl. Resp. Ex. R).  Then, in an August 4, 2009 e-mail, Hagmaier said "I cannot continue to prepay the TW claims.  Twenty five thousand a month and climbing is too much."  8/4/09 E-mail, Pl. Resp. Ex. R; Pl. Resp. at 8. And on March 30, 2010, Hagmaier sent an e-mail to a car dealership saying that NWC would communicate directly with the dealership, rather than going through the plaintiffs, as part of an effort to revise the process "due to the escala[t]ing losses exceeding $330,000 in a[n] 18-month period."  3/30/10 Letter, Pl. Resp. Ex. R.

16

The plaintiffs also identify as inconsistent
Hagmaier's August 31, 2009 statement to Mini of the Main Line
that "[d]ue to extremely high losses, NWC's Tire & Wheel
Protection Program . . . will be terminated as of October 1,
2009", Pl. Resp. Ex. S, and Hagmaier's October 11, 2009 e-mail
to Tuno proposing a new Tire and Wheel warranty policy.  Pl.
Resp. Ex. T, Pl. Resp. at 9.

But this evidence shows no inconsistencies.  Instead,
it is clear that Hagmaier hoped and anticipated that the Tire
and Wheel policy would become profitable, but it did not turn
out to be.  There is no evidence at all that the statements
Hagmaier made that she <u>hoped</u> the program would be profitable
were false when they were made.  Nor is there any inconsistency
between her view in August of 2009 that the Tire and Wheel
program was unprofitable and an effort in October of that year
to introduce a revised program in hope of a return of
profitability.  Because plaintiffs have cited no evidence of any
misrepresentation, we will not consider these allegations
further.

3.    Representations Regarding
      <u>Coverage Under the Tire and Wheel Policy</u>

According to the plaintiffs, "Hagmaier lied to
Plaintiff as to whether certain types of damage would be covered

17

under the Tire & Wheel policy." Id. at 11.  Tuno contrasts a
February 19, 2008 letter from Hagmaier with a January 26, 2010
letter from an NWC claims representative.  In 2008 Hagmaier
wrote, "in the event that a covered tire is damaged by a
pothole, to the extent of a large bubble in the sidewall that
would affect it's [sic] performance or safety, our program would
consider this damage as a viable claim", 2/19/08 Letter, Pl.
Resp. Ex. EE.  In 2010, the NWC employee responded to a question
from a dealership employee who asked, "SO BLOWN OUT TIRES, EVEN
IF THE ONLY DAMAGE IS FROM THE BLOW OUT ARE NOT COVERED???
TIRES WITH BUBBLES ARE COVERED??" by saying, "The exclusion is
for 'sidewall damage.'  Any tire with sidewall damage, in any
form, is not a covered loss."  1/26/10 E-mail, Pl. Resp. Ex. FF.

　　　　According to Hagmaier's testimony, in April of 2008
NWC implemented a new Tire and Wheel Agreement that excluded
"bubbles" and "side wall" damage:

> Q:  What about bubbles on sidewalls, did you
> cover that?
>
> A:  It depends on which coverage it had.
> The DH-7 form specifically excluded sidewall
> coverage.
>
> Q:  What's the year of DH-7?
>
> A:  . . . Excuse me, I need to correct that.
> That's the form that I did not submit
> because it was not printed.  DL-6 is the one
> that was used from April of '08 until the
> program was canceled.

> . . .
>
> Q:  Prior to 2008, that would cover bubbles,
> the tire and wheel program?
>
> . . .
>
> A:  . . . If there were witness marks that
> confirmed pothole damage then the sidewall
> would have been covered.

Hagmaier Dep., Def. Mot. Ex. D at 178-179.  Again, the evidence

plaintiffs cite fails to show a misrepresentation -- instead, it

shows two different, but accurate, representations of two

different plans for coverage.  We need not consider this claim

further.

### 4.   Representations Regarding GAIC Audit of NWC

The plaintiffs allege that "Hagmaier falsely claimed

that she had no knowledge of" an audit that GAIC allegedly

conducted of NWC.  Pl. Resp. at 12.  The denials of that

knowledge all took place during Hagmaier's deposition, and so

could not have given rise to plaintiffs' claim.  We will not

consider them further.

### 5.   Facts Relating to Injury

The plaintiffs aver that dealerships asked Tuno to

reimburse them for approved claims that NWC refused to pay and

that Tuno reimbursed them in order to maintain goodwill, id. at

12.  Zeke Kos, the Finance and Insurance Manager at BMW of the

Main Line, and Samuel Silverman, the Finance and Insurance
Manager at Holman BMW, both swore that WCDS reimbursed them to
cover the cost of claims that had been improperly denied by NWC.
Kos Aff., Pl. Resp. Ex. L, ¶¶ 8, 10; Silverman Aff., Pl. Resp.
Ex. M, ¶ 10.  Exhibit JJ to the plaintiffs' response shows that
WCDS paid approximately $18,000 to those dealerships.

        The plaintiffs also aver that they lost revenue from
commissions when dealerships cancelled their policies with NWC
because they were dissatisfied with the service NWC provided.
BMW of the Main Line, Holman BMW, and BMW of Mt. Laurel stopped
doing business with WCDS.  Pl. Resp. at 13 (citing Ex. L, M,
KK).  On February 3, 2010 the plaintiffs also received a list of
thirty-four customers from DeSimone BMW who had cancelled NWC
policies between September 2009 and February 3, 2010.  Id. Ex.
LL.

        B.    Other Allegedly False Representations

        The plaintiffs assert that

        Hagmaier represented in various phone calls
        that various products were covered by
        insurance policies, when they were not.
        This occurred shortly after the 2005
        Agreement was entered.  Hagmaier made these
        claims regarding several NWC programs,
        including . . . Complete Care, Tire and
        Wheel, Vehicle Replacement, and Lease Wear
        and Tear.

Id. at 14-15.  This is the same language we found insufficiently specific to state a claim in our June 12, 2012 Order, and it is likewise insufficient to sustain a claim here.

### 1.   NWC's Tenure

Plaintiffs cite Tuno's own deposition as evidence that "[u]pon meeting Plaintiff, Hagmaier stated that NWC was a Third Party Administrator since 1988 and a Florida 634 Company", id. at 14 (citing Tuno Dep., Pl. Resp. Ex. P, at 43-45), and they again cite Tuno's deposition for the supposedly contradictory evidence that "Plaintiff later learned that Hagmaier had only purchased NWC a year prior."  Id. (citing Tuno Dep., Pl. Resp. Ex. P., at 50).  This evidence at best suggests that Hagmaier herself had not been involved in administering insurance contracts since 1988, and, since she did not say she had been, it cannot constitute a false representation.

### 2.   Auto Knight Coverage

The plaintiffs also aver that "with regard to Complete Care, in approximately 2006 or 2007, Hagmaier first claimed to Plaintiff that the program was insured by Autoknight . . . [h]owever, Plaintiff later determined that Autoknight was not an insurer of Complete Care."  Id. at 15.  On September 18, 2009,

21

Jerry Muller, an accounting manager with NWC, e-mailed Jeff Rizzo of Auto Knight saying,

> To confirm that Auto Knight has received and uploaded all the Complete Care policies from Nation Warranty Corporation, I have attached a file that has all these policies that we have sent.  Can you please review this file to assure that you have all these policies active in your system?

9/18/09 E-mail, Pl. Resp. Ex. PP.  Tuno testified that although he initially believed that Auto Knight was insuring Complete Care, he "later determine[d] that Auto Knight was not standing behind this product" because "our dealers' customers called a claimant, or a dealer called a claimant, and there were no records found of the policy", Tuno Dep., Pl. Resp. Ex. P, at 67-68.

Tuno testified that NWC later resolved the Auto Knight coverage problem:

> Q:  Did Auto Knight say that they had no record of those policies, is that what you're saying, or on some of those policies?
>
> A:  On some of those policies.
>
> Q:  Did you ever find out what happened to those policies where there was no record?
>
> A:  Bridget Bullion got involved in it and ultimately resolved that matter.
>
> Q:  How was it resolved?
>
> A:  She reconciled and made sure that they were in the system, in NWC's system, and on Auto Knight's system.

Id. at 246-47.

The only evidence Tuno cites of Hagmaier's statement that Auto Knight backed Complete Care is the statement in his own deposition that NWC told him that Complete Care was backed by Auto Knight.  Tuno Dep., Pl. Resp. Ex. P, at 67.  The evidence Tuno cites shows that Auto Knight did provide coverage, and so there is no evidence of a false representation and we will not consider this allegation further.

### 3.   MultiCare Policies

In his response to defendants' interrogatories, Tuno averred that "Hagmaier stated in phone conversations in approximately 2007-2008 that all MultiCare policies would be processed by NWC as a [Third Party Administrator]", Pl. Supp. Resp. to Def. Interrog., Pl. Resp. Ex. QQ, at 2.  Tuno argues that this representation was inconsistent with NWC's practice whereby "customers that would call in for claims were told that they had no record of the policy."  Tuno Dep., Pl. Resp. Ex. P, at 91.  As an example, plaintiffs cite an e-mail from the Director of Claims at AutoXcel Corporation stating that a customer named Andi Reiback "called NWC Corp. and was told to call us and then did that and was told her contract could not be located . . . she doesn't have one of our contracts."  9/28/12

23

E-mail, Pl. Resp. Ex. DDD.  This e-mail contradicts the
plaintiffs' characterization of Reiback's experience: "a
MultiCare customer named Andi Reiback attempted to make a claim
but was told by NWC that her contract could not be located."
Pl. Resp. at 15.  It is clear from the e-mail that AutoXcel
Corporation, rather than NWC, told Reiback it had no record of
her claim (e.g., ". . . doesn't have one of our contracts."
9/28/12 E-mail, Pl. Resp. Ex. DDD. (emphasis added)).  If
plaintiffs' point is that NWC was responsible for not recording
Reiback's policy with AutoXcel, they make no factual averments
to support this conclusion.  They do not show, for example, that
Reiback had a policy with NWC, nor do they cite any other
specific evidence of NWC's alleged failure to refer claims to
AutoXcel, relying instead on Tuno's vague and unsupported
assertion in his deposition that "in numerous instances,
customers would call me in or dealerships would call in and NWC
told them they have no record of the policy."  Tuno Dep., Pl.
Resp. Ex. P, at 94-95.

    4.  GAP Products

      With regard to NWC's GAP products -- policies that
"relieve the consumer of a deficiency balance in the event of a
total loss of their vehicle when they finance or lease that
vehicle", Id. at 52-53 -- Tuno testified that Hagmaier

"represented her products to be approved by a number of lenders."  Id. at 53.

Those "representations" appear to consist of the following e-mails.  On November 17, 2006, Hagmaier forwarded an e-mail to Tuno from SE Toyota Finance approving financing for NWC's GAP Addendum for the states of Florida, Georgia, North Carolina, and South Carolina.  11/17/06 E-mail, Pl. Resp. Ex. RR.  On July 19, 2007, Hagmaier copied Tuno on an e-mail to Muller saying, "I confirmed with Wesley at Allstate that they would accept policies over 84 months . . . Please reconfirm this again with Allstate and have them put it in writing in an e-mail.  Once reconfirmation is received, please update Michael."  7/19/07 E-mail, Pl. Resp. Ex. SS.  On November 14, 2007, Hagmaier forwarded an e-mail to Tuno in which Juliana Blanco, an agent at Allstate, wrote, "the filing has been approved," and in that e-mail asked another Allstate employee to "forward Dyana the approved filing from PA for the Toyota endorsement." 11/14/07 E-mail, id.  On November 16, 2007, Hagmaier e-mailed a Toyota representative stating, inter alia, "the required PA endorsement [] has been approved by State", and adding, "[w]ith your approval, we would like to install this program on December 1, 2007."  11/16/07 E-mail, id.  And on December 9, 2007, Hagmaier again e-mailed Toyota with information necessary to

secure approval of the program in Pennsylvania.  12/9/07 E-mail,
id.  She then wrote to Tuno on December 27, 2007 saying
"Allstate confirmed that they are refiling in PA & NJ to satisfy
Toyota."  12/27/07 E-mail, id.  On January 23, 2008, Hagmaier
wrote to Tuno to say, "it looks like no re-filings will be
required" for Toyota approval, and said that an Allstate
employee would e-mail Toyota for "final approval."  1/23/08 E-
mail, id.  On July 31, 2008, Hagmaier e-mailed Tuno saying,
"Ford is now requiring a sponsor dealer in order for them to
continue 'reviewing' our form . . . [p]lease have Bill Marsh
Ford execute the attached form . . . ."  7/31/08 E-mail, Pl.
Resp. Ex. EEE.  That attachment said, "Our dealership would like
to offer the Nation Warranty Corporation's GAP program that is
insured by First Colonial Insurance Company (Allstate)."  Id.

        Plaintiffs contend that these representations were
false in light of evidence that Toyota did not provide coverage
for the GAP policy.  Pl. Resp. at 16.  Specifically, they point
to a March 19, 2008 e-mail from a Toyota employee saying
"approval still needs to be obtained.  I still need to submit
the revised form for approval", 3/19/08 E-mail, Pl. Resp. Ex.
TT, and Hagmaier's deposition testimony in which she said that
for the GAP policy, NWC was the third-party administrator but

26

was not the obligor.  Pl. Resp. at 16 (citing Hagmaier Dep., Pl. Resp. Ex. G at 36, 39).

Plaintiffs have failed to show a genuine issue of material fact that these e-mails involved fraudulent misstatements.  Nowhere in the correspondence plaintiffs identify did Hagmaier say that Toyota had approved the policy, and so the statement from the Toyota representative that the policy had not been approved, and Hagmaier's deposition testimony about the GAP policy do not render her statements false.

5.   PermaPlate Policies

With regard to PermaPlate Policies, plaintiffs aver that "NWC acted as a Third Part[y] Administrator of these policies and administered claims under said policies."  Pl. Resp. at 16.  In support, they cite an e-mail from Bullion to Tuno and Hagmaier attaching a copy of PermaPlate's claim procedures and saying, "I finally got the stamp of approval from PP", 11/19/08 E-mail, Pl. Resp. Ex. UU.  They say that this statement was shown to be false when Tuno in 2011 discovered that NWC had failed to send policies to PermaPlate for which Tuno had paid it.  The plaintiffs support the PermaPlate allegation with a citation to Tuno's deposition:

Q:  Tell me about PermaPlate.

27

> A:  We sold PermaPlate and NWC was the
> carrier, the TPA for us to mail all of those
> policies and proceeds to from [sic] our
> dealers selling those contracts.  We learned
> in 2011, March of 2011, as a result of a
> claim at many of the Main Line and the
> dealer, Steve Holstad, who called me because
> PermaPlate had no record of the policy that
> they sold sent to us and we sent to NWC.  In
> fact, there were approximately two dozen of
> those policies.
>
> . . .
>
> A:  [PermaPlate] took our records, they
> matched them against the records they
> received from NWC.  Jamie Johnson was one of
> the folks at PermaPlate that was involved in
> this work with us and identified that those
> policies were never sent to them from NWC
> for 18 months.

Tuno Dep., Pl. Resp. Ex. P at 152-54.

We will address this below in Section IV.

6.   Stay Nu Policies

The plaintiffs also aver that "Hagmaier failed to submit policies for StayNu."  Pl. Resp. at 17.  Tuno testified that in 2007 and 2008 he sold "a couple hundred" Stay Nu policies and sent the payment for, and information about, the policies to NWC.  Tuno Dep., Pl. Resp. Ex. P at 158.   Tuno testified:

> A:  . . . And what we found out as time
> moved along is that those policies -- the
> NWC had no record of those policies.  And
> our consumer would call the dealer, the
> dealer would call us . . . wondering where
> is that policy that we paid for, what did

you do with the policy, what did you do with
the money.

. . .

A:  We contacted StayNu directly, much as in
the same fashion as PermaPlate, and the
owner of StayNu, Mark Evans, and I agreed
for purposes of our business relationships
with dealers to handle those claims.

. . .

Q:  Is it your testimony . . . that NWC had
a record of none of [the Stay Nu policies]
or there was some missing once, just so I'm
clear?

A:  The vast majority of those were missing.

. . .

Q:  Is there any claim that wasn't paid by
StayNu?

A:  StayNu and NWC?

Q:  Yes.

A:  During that period of time?

Q:  Right.

A:  Not that I'm aware of.

Id. at 158-161.  In support of the argument that NWC had failed

to send policies to Stay Nu, the plaintiffs also cite e-mail

correspondence in Exhibit BBB which appears to show that Stay Nu

could not find a record of William Hamlet, but seems to have

found the policies for the ten other clients listed in the e-

mail exchange.  See Pl. Resp. Ex. BBB.[3]  The plaintiffs also aver that Hagmaier said that NWC would continue to administer Stay Nu policies after it terminated its relationship with AutoXcel, Pl. Resp. at 17 (citing 1/8/09 Letter from Hagmaier, Pl. Resp. Ex. CCC) but later said that it would not administer these policies, Pl. Resp. at 17 (citing Pl. Supp. Resp. to Def. Interrog., Pl. Resp. Ex. QQ, at 3).

We will address this, too, in Section IV below.

7.  Cancellation Billing

The last fraudulent misstatement plaintiffs allege is Hagmaier's alleged waiver of the requirement that plaintiffs repay the defendants their commissions for cancelled policies. Pl. Resp. at 18.  According to Tuno's deposition, Muller, as Accounting Manager for NWC, failed to invoice the plaintiffs for refunds of commissions for cancelled policies, and Hagmaier, after telling Tuno about Muller's failure, allegedly said, "because of our relationship, I'm not going to hold you accountable for our shortcomings or our administrative problems in NWC".  Tuno Dep., Pl. Resp. Ex. P at 221 - 22.  Tellingly,

---

[3] This is the most sense we can make of Exhibit BBB, which contains thirty-six pages of unlabeled miscellany.  We remind the plaintiffs that their obligation is to "designate 'specific facts [in the record] showing that there is a genuine issue for trial'", Celotex, 477 U.S. at 324 (emphasis added), and, as the Seventh Circuit has explained, "Judges are not like pigs, hunting for truffles buried in briefs."  United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

the plaintiffs do not cite any correspondence from Hagmaier to
this effect, and the e-mail from Hagmaier to Tuno in Exhibit WW
suggests that she did not intend to forgive the debt:

> As you have most likely heard, we parted
> ways with Jerry last week . . . Michael was
> getting accustomed to Jerry's files and
> cannot locate a trail where WCDS has
> reimbursed NWC for the agent's portion of
> cancellation chargebacks when NWC issued a
> full refund to the dealer.  Please tell me
> that this isn't true and we are just missing
> something in Jerry's records?

1/25/10 E-mail, Pl. Resp. Ex. WW.

Plaintiffs suggest that Hagmaier's alleged statement
discharging plaintiffs of liability was fraudulent because she
subsequently sent the plaintiffs two years of bills for
cancellations totaling $25,000 and demanded full and immediate
payment.  Pl. Resp. at 18 (citing 6/10/10 Letter from Hagmaier
to Tuno demanding payment, Pl. Resp. Ex. XX).

IV.  <u>Analysis</u>

Sifting through plaintiffs' copious allegations to
unearth those that could possibly sustain plaintiffs' claim, we
are left with six alleged fraudulent misrepresentations: (1)
Bullion's "song and dance" about the cause of the delay in
reimbursing claims under the Tire and Wheel plan; (2) Hagmaier's
e-mails regarding the thirty-day turn-around; (3) Hagmaier's
statement that the processing of Tire and Wheel policy claims

31

was delayed because the reserves in the trust account were exhausted and NWC was waiting for GAIC to pay it; (4) NWC's statement that it would process MultiCare policies as a third-party administrator; (5) NWC's statements that it would similarly process PermaPlate and Stay Nu policies; and (6) Hagmaier's statement that Tuno did not have to reimburse defendants for commissions plaintiffs received for cancelled policies.  We will consider each allegation in turn.

   1.   Bullion's "Song and Dance" About Delay

        The plaintiffs argue that Bullion's statements explaining the delay -- which she herself described as a "song and dance" -- were "false statements to Plaintiff and others to mask Hagmaier's delaying of payments for no legitimate reason." Pl. Resp. at 24.

        As we have discussed, in order to survive a summary judgment motion the plaintiffs must point to sufficient evidence in the record to support a reasonable jury's finding by clear and convincing evidence that defendants are liable on each aspect of what constitutes fraudulent inducement under Pennsylvania law.  Here, the plaintiffs have pointed to evidence of a representation that was made with knowledge of its falsity and was intended to mislead the dealerships into relying on it, and so the first, third, and fourth elements are satisfied.

But defendants contend that this claim nevertheless must fail because Tuno has not pointed to any evidence to support the sixth element -- that is, that any injury resulted from reliance on these statements.  We agree.  As the defendants point out, Bullion "was not involved in the accounting process and therefore, was unable to testify whether any policies were not paid by NWC."  Def. Mot. at 29.

Tuno points to two economic injuries that he alleges arise out of Bullion's misstatements: first, he alleges that in order to maintain good will with the dealerships he provided money to them to cover the cost of claims NWC had denied, and, second, he points to his loss of commission revenue due to policy cancellations.  Pl. Resp. at 13.

The logical path Tuno wishes us to follow is that dealers relied on Bullion's representations that NWC was still considering their claims and had not wrongly denied them and when dealers discovered this was untrue they cancelled their policies.  This argument fails for two reasons.  First, there is a logical gap in the reliance argument -- if the injury Tuno suffered was based on policy cancellations, even reading the facts in the light most favorable to Tuno, those cancellations resulted from the dealers' realization that NWC was wrongly denying claims, not their reliance on NWC's statements that they

were not doing so.  Moreover, though Tuno provides a list of
dealers who cancelled their policies, id. Ex. II, he has not
pointed to any evidence that these are the same dealers as those
to whom Bullion made false statements or that there was any
causal connection between her statements and their
cancellations.  Because the plaintiffs' allegations rely on
Bullion's vague deposition testimony, they lack the
particularity necessary to sustain a fraudulent
misrepresentation claim.

     2.    <u>Hagmaier's E-mails About the Thirty-Day Turn-Around</u>

       The plaintiffs claim that Hagmaier's e-mails saying,
"We have been working with GAIC regarding weekly submittal of TW
claims so the reimbursement can be made to [dealers] within 30
days" and that the NWC entities had "initiated a request to GAIC
to process our TW claims for your store on a bi-monthly basis so
we have more control on the 30 day turn around" were false and
are actionable because "[a] statement of present intention which
is false when uttered may constitute a fraudulent
misrepresentation of fact", id. at 23 (quoting <u>Brentwater Homes,</u>
<u>Inc. v. Weibley</u>, 369 A.2d 1172, 1175 (Pa. 1977)).

       But a closer look at the factual claims in Hagmaier's
e-mails reveals that the plaintiffs cannot sustain this claim.
Hagmaier did not say in these e-mails that she <u>would</u> make

payments within thirty days; she said that she had been working with GAIC to speed up the payment and that she had initiated a request to GAIC to change its processing procedure.  Far from demonstrating that a reasonable jury could find the statements false by clear and convincing evidence, the plaintiffs have not pointed to any evidence even suggesting that these statements were false.  The plaintiffs thus cannot survive summary judgment on the basis of these statements.

>    3.   Hagmaier's Statement That The
>         Depleted Trust Fund Reserves Caused
>         The Delay in Processing Tire and Wheel Claims

The plaintiffs sought to compel production of "NWC's trust account documents and Defendant's tax documents" in order to prove "that monies to pay on claims were going into the trust account and/or Hagmaier's account, that monies existed to pay on approved claims, and that monies in the trust account were not being used for timely payment and/or not being used at all." Pl. Mot. to Compel at 12.

This scenario is impossible in light of Hagmaier's deposition testimony that Great American controlled the trust fund account.  But even if plaintiffs were able to prove that Hagmaier was retaining money in the trust account rather than using it to pay valid claims, this evidence would not support a claim for fraudulent misrepresentation because the causal

35

connection is missing between the representation and the damage the plaintiffs allege.

As we discussed above, the plaintiffs' argument is that Hagmaier lied and said that the depleted reserves were responsible for the delay, and, in reliance on this lie, Tuno and the dealers continued doing business with NWC.  Then, when everyone realized Hagmaier's representations were not true -- and instead that NWC was denying valid claims -- WCDS either had to pay for the claims itself or the dealers cancelled their policies, resulting in a loss of commission revenue to plaintiffs.  But the cause of such injury in that case is not reliance on the alleged misrepresentation, but a disbelief in that misrepresentation.  If the dealers cancelled their policies out of frustration that valid claims were being rejected, doing so demonstrated that they did not believe Hagmaier's alleged misrepresentations.  As a result, the plaintiffs cannot prove the "justifiable reliance" element of unjust enrichment and so cannot sustain their claim on this ground.

Because the trust account information -- even if it showed the damning information plaintiffs allege -- would not support a claim of fraudulent misrepresentation, we will deny the plaintiffs' motion to compel.[4]

---

[4] With regard to the balance of the information plaintiffs seek, having reviewed plaintiffs' requests and the responses

    4.    NWC's Statement That It
          Would Process MultiCare Policies

          With regard to the MultiCare policies, the plaintiffs

allege that Hagmaier and the NWC entities have made a fraudulent

misrepresentation because they said they would process claims as

a third-party administrator but did not do so in that they

failed to file policies with the insurance companies who were

backing the product.  Pl. Resp. at 15.

          The plaintiffs support this claim by showing that one

car owner, Andi Reiback, called AutoXcel and was told she did

not have a policy with them.  Tuno points to no evidence that

Reiback even had a policy with NWC.  Moreover, Tuno's statement

during his deposition that this happened many times is

unsupported by specific examples.  This evidence falls far short

of plaintiffs' burden of designating specific facts that would

allow a reasonable juror to find by clear and convincing

evidence that the statement that NWC would act as a third-party

administrator for MultiCare products was even false, let alone

_____

defendants have already submitted, we agree with the defendants
that "most if not all of the documents requested . . . are
already in Plaintiffs' possession, and were previously produced
by Plaintiffs in response to Defendants' discovery requests."
Although, as defendants note, "[i]n Mr. Tuno's position as an
agent, he was not a party to any of the agreements between NWC
and the customer, dealership, or insurer," it appears that "[t]o
the extent that non-privileged information related to this case
is available, it has already been produced by either the
Defendants or Plaintiffs."  Def. Mot. in Opp. at 5.  As such, we
will deny plaintiffs' second motion to compel.

that it was made with knowledge of its falsity or with recklessness as to whether it was true.

The plaintiffs have failed to sustain their claim on the basis of this evidence.

   5.   PermaPlate and Stay Nu Policies

With regard to the PermaPlate and Stay Nu policies, the plaintiffs allege that the defendants fraudulently misrepresented their role because defendants said they would act as a third-party administrator for those products but did not timely forward those policies to PermaPlate and Stay Nu.  Pl. Resp. at 16-17.  The defendants respond that these contentions amount to a breach of contract claim because they are claims that the defendants did not record policies in a timely fashion. Def. Mot. at 21-22.

We agree.  The plaintiffs appear to contend that defendants engaged in fraudulent misrepresentation by implying that they would process claims in a timely fashion when they held themselves out as a third-party administrator and then failed to do so.  But more is necessary to sustain a claim of fraudulent misrepresentation under Pennsylvania law.  As we described above, this cause of action requires a showing that a statement was "made falsely, with knowledge of its falsity or recklessness as to whether it is true or false", and plaintiffs

quite conspicuously have not proffered a scintilla of evidence regarding scienter.  Plaintiffs have therefore failed to sustain their claim with regard to the PermaPlate or Stay Nu policies.

We will thus grant the defendants' motion for summary judgment on these aspects of plaintiffs' claim.

    6.    Hagmaier's Statements
          Regarding Cancellation Reimbursements

The plaintiffs have failed to show any injury arising from this alleged misrepresentation.  Presumably, the injury would be the costs related to commissions lost when dealerships cancelled their policies with NWC, but the existence of such costs depends on the outcome of the defendants' action in the Bucks County Court of Common Pleas (as we discuss below) and so we will not consider that claim here.

V.    Defendants' Counterclaims

In their Answer, the defendants assert two counterclaims, one for breach of contract and one for unjust enrichment.  The defendants argue that, pursuant to the Agent Agreement, although plaintiffs would receive a commission for arranging contracts between car dealers and the defendants, the plaintiffs were to refund any commissions received for contracts that were later cancelled.  Answer ¶¶ 106 - 108.  The defendants argue that the plaintiffs owe them $42,114.90 in such

39

"cancellation chargebacks".  Id. at ¶¶ 117-18.  The defendants
move for summary judgment on these counterclaims.

The plaintiffs argue that under the first-filed rule,
defendants' counterclaims must be dismissed because the
defendants asserted these claims in their earlier-filed action
in the Court of Common Pleas of Bucks County.  Pl. Resp. at 41.

The first-filed rule does not apply to this case,[5] but
because we granted summary judgment on the plaintiffs' claim --

---

[5] As our Court of Appeals explained in EEOC v. Univ. of
Pennsylvania, 850 F.2d 969 (3d Cir. 1988), under the first-filed
rule, "[i]n all cases of federal concurrent jurisdiction, the
court which first has possession of the subject must decide it."
Id. at 971 (quoting Crosley Corp. v. Hazeltine Corp., 122 F.2d
925, 929 (3d Cir. 1941)).  By its terms, the rule applies only
to cases filed concurrently in federal courts.  Recently, a
court in our Circuit applied the first-filed rule where parallel
suits were pending in state and federal court, see Catlin
Specialty Ins. Co. v. Plato Const. Corp., No. 10-5722, 2012 WL
924850 (D.N.J. Mar. 19, 2012).  However, our Court of Appeals
has yet to approve this application, and the U.S. Supreme Court
acknowledged the difference between concurrent state and federal
proceedings and concurrent proceedings in two federal courts in
Colorado River Water Conservation District v. United States, 424
U.S. 800 (1976), where it explained that "[t]he difference in
general approach between state-federal concurrent jurisdiction
and wholly federal concurrent jurisdiction stems from the
virtually unflagging obligation of the federal courts to
exercise the jurisdiction given them."  Id. at 817.
    Indeed, as the Supreme Court counseled, "[g]enerally,
as between state and federal courts, the rule is that 'the
pendency of an action in the state court is no bar to
proceedings concerning the same matter in the Federal court
having jurisdiction'", id. at 817 (quoting McClellan v. Carland,
217 U.S. 268, 282 (1910)), and a federal court should only
decline to hear a case because an identical case had already
been filed in state court in "exceptional circumstances" and
where doing so "would clearly serve an important countervailing
interest."  Colorado River, 424 U.S. at 813 (quoting County of

the only claim that met the amount-in-controversy requirement --
we will not hear the state law counterclaims over which we have
only supplemental jurisdiction.  See 28 U.S.C. § 1367 ("The
district courts may decline to exercise supplemental
jurisdiction over a claim . . . if . . . the district court has
dismissed all claims over which it has original jurisdiction.").

     Dismissal of the state law counterclaims here will not
prejudice the defendants as an identical action is already
pending in the Bucks County Court of Common Pleas.


     BY THE COURT:

     /S/ STEWART DALZELL, J.

---

Allegheny v. Frank Hashuda Co., 360 U.S. 185, 188-89 (1959).
Where, as here, the original claim is dismissed, § 1367 controls
the exercise of our discretion to hear the remainder of the
action.

41